467 F.2d 456
 KOMMANVITTSELSKAPET HARWI (ROLF WIGAND) Owner of the MOTOR
VESSEL GERWI, Appellant in No. 18301,
v.
The UNITED STATES of America, Appellee.
Appeal of BERGENS SKIBSASSURAN-SEFORENING, in No. 18302.
 Nos. 18301, 18302.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 15, 1971.
Resubmitted Under Third Circuit Rule 12(6) July 20, 1972.
Decided Sept. 26, 1972.
 
 Richard W. Palmer, Rawle & Henderson, Philadelphia, Pa., for appellants.
 William Bradford Reynolds, Asst. Sol. Gen., Washington, D. C., for appellee.
 Before SEITZ, Chief Judge, VAN DUSEN, Circuit Judge, and MASTERSON, District Judge.
 OPINION OF THE COURT
 VAN DUSEN, Circuit Judge.
 
 
 1
 Kommanvittselskapet Harwi (Rolf Wigand), a Belgian corporation owning the Norwegian vessel Gerwi, brought suit against the United States under Section 742 of the Suits in Admiralty Act (46 U.S.C. Sec. 742),[1] alleging that the Government was liable to it for damages which the vessel incurred when it grounded on rocks while it was proceeding up the Delaware River in the channel known as the Torresdale Range on May 23, 1963.
 
 
 2
 Plaintiffs contend that the negligence of the Government consisted of publishing misleading channel depth statements which bore no relation to the actual depths appearing on the Torresdale Range as marked on the navigational chart, in failing to survey and maintain the existing Torresdale Range to the depths indicated on the depth statement, and with failing to mark and thereby make navigable the new channel for which it was publishing depth statements.
 
 
 3
 After a lengthy trial, the district court found the United States not liable under any of these theories.[2] The trial court held that the United States had no statutory or assumed duty to survey or dredge the existing channel on a regular basis, and that the United States was not negligent in failing to notify the users of the waterway that the existing channel, as marked by range lights and buoys, was no longer being surveyed or maintained. Furthermore, it was held that the Government did not make any negligent representations in the May 3, 1963, channel depth statement. The court added that even assuming negligence on either theory, it was not satisfied that plaintiffs had proved that the grounding of the Gerwi was caused by such negligence. Finally, the court held that the United States was not negligent in failing to mark the "project" channel.
 
 
 4
 At the time of the grounding, the Gerwi drew 27 feet 11 inches of water. As the vessel approached the Torresdale Range, the pilot saw a Corps of Engineers dredge flotilla on the edge of the range, and attempted to establish radio contact with it. The Coast Guard vessel Zinnia responded to the Gerwi's call to the dredge flotilla and advised the pilot to pass the flotilla on the Pennsylvania (left of center) side of the channel.
 
 
 5
 The pilot entered the Torresdale Range and aligned the Gerwi's extreme starboard side with the range lights marking the center of the range. As the Gerwi drew abeam of the drill boat accompanying the dredge, she struck rocks which pierced her 1, 2 and 3 port double bottom tanks resulting in the damages for which claim was brought in the district court.
 
 
 6
 Pilot Lappe had first class pilotage licenses issued by the United States Coast Guard and the State of Pennsylvania to pilot vessels from the Delaware Bay to Trenton on the Delaware River (77a-78a). He had piloted vessels on the Delaware River since 1953. The findings of the trial judge which are supported by evidence and are not clearly erroneous include these:
 
 
 7
 "28. The fact that the new or 40' channel and the old or 25' channel on Torresdale Range were not coincident was common knowledge among shipping and navigation interests concerned with the upper Delaware River (N.T. 459-60).
 
 
 8
 "29. Pilot Lappe did not have nor did he inspect at Pilots Association the Survey Sheet of November 7, 1962, prepared by the Corps of Engineers (R-I) on which it clearly appears that the old (25') and the new (40') Torresdale Range are separate and do not coincide. (N.T. 165). Pilot Lappe, however, knew prior to May 23, 1963, that there was an old channel and a new project channel in the Torresdale Range area and that these channels were not coincident, and he did not need the survey sheet of November 7, 1962 (R-I) to apprise him of this fact. (N.T. 165).
 
 
 9
 ******
 
 
 10
 * * *
 
 
 11
 On May 10, 1963, Captain Powell of Norton, Lilly met with the Pilots Association on increasing the draft to 28' feet. . . .
 
 
 12
 ******
 
 
 13
 * * *
 
 
 14
 "32. The first 28' draft ship which sailed from Philadelphia to Morrisville was the ORE VENUS on May 12, 1963-28'; followed by the GALASSIA on May 13, 1963-28'; third the RIO ORINOCO on May 18, 1963-28'; fourth the EDERA on May 21, 1963-28'. The GERWI was the fifth 28' ship (Powell Deposition 56).
 
 
 15
 "33. Pilot Lappe had taken both the RIO ORINOCO on May 18 and the EDERA on May 21 up the Torresdale Range (N.T. 137-8)."
 
 
 16
 305 F.Supp. 882, 887.
 
 
 17
 The grounding in this case occurred when the pilot Lappe steered the Gerwi to the side of the channel in order to avoid the dredging boat. A pilot who is beginning to take deeper draft vessels into a channel which has been used for vessels with lesser drafts would be under a stronger duty to check depths.[3] Lappe appears to have relied on his prior center channel trips up the Torresdale Range and the reports of the other pilots who had taken 28' draft vessels up the river that they had experienced no difficulty. At 157a, Lappe testified:
 
 
 18
 "But the fact that there were three ships prior to this, I had no reason to think that the 'Gerwi' couldn't pass at 28 feet."
 
 
 19
 (There were actually four such ships that had preceded the Gerwi going north on the Delaware River-see finding 32 quoted at page 1359 above.)
 
 
 20
 The evidence shows that the district court was justified in finding that the Government publications received in evidence were not the cause of the vessel's grounding.[4] See Kommanvittselskapet Harwi (Rolf Wigand) v. United States, 305 F.Supp. 882, 890-894 (E.D.Pa.1969). For this reason, we need not decide whether the Government published inaccurate and misleading information concerning depths in the Torresdale Range in Exhibit L-9[5] (U.S. Army Engineers Statement, showing PROJECT Depth of 40 Feet for Torresdale Range and minimum depth as of May 3, 1963 of 29.9 feet in such Range).
 
 
 21
 The district court found that, "even assuming that the May 3 statement (Exhibit L-9) was misleading and that publication of it was negligent under the circumstances, the plaintiff has not carried his burden of convincing us that the Gerwi, its crew and pilot, relied on the accuracy of this statement and that such reliance was a cause in fact of its grounding."[6] This finding is amply supported by the record and, therefore, not clearly erroneous.
 
 
 22
 We note that depths in the Keystone Range, as shown on L-9, were all 23.8 feet or less, so that Lappe could not have been relying on that May 3, 1963, statement as an accurate statement of depths in all those portions of the river to be traversed by his vessel drawing 27 feet 11 inches. This evidence, the testimony quoted above at page 5, and the statement by the trial judge that he was "dubious" of an assertion by Lappe concerning L-9 (894 of 305 F.Supp.) are among the items supporting the abovequoted statement of the district court. This court is not "left with the definite and firm conviction that a mistake has been committed." See McAllister v. United States, 348 U.S. 19, 20, 75 S.Ct. 6, 8, 99 L.Ed. 20 (1954).
 
 
 23
 We have given careful consideration to the other contentions of libellants and find they are without merit.
 
 
 24
 The judgment of the district court will be affirmed.
 
 
 25
 Judge Masterson dissents for the reasons stated in the per curiam opinion joined in by a majority of the panel, filed on September 29, 1971, and vacated by order of February 24, 1972, which is annexed as an exhibit to this opinion.
 
 
 26
 EXHIBIT TO OPINION FILED SEPTEMBER 26, 1972 IN NOS. 18,301 and 18,302.
 
 OPINION OF THE COURT
 
 27
 (Filed September 29, 1971)
 
 PER CURIAM:
 
 28
 Kommanvittselskapet Harwi (Rolf Wigand), a Belgian corporation owning the Norwegian vessel Gerwi, brought suit against the United States under Section 742 of the Suits in Admiralty Act (46 U.S.C. Sec. 742),[1] alleging that the Government was liable to it for damages which the vessel incurred when it grounded on rocks while it was proceeding up the Delaware River in the channel known as the Torresdale Range on May 23, 1963.
 
 
 29
 At the time of the grounding, the Gerwi drew 27 feet 11 inches of water. Its navigator[2] was relying upon a navigational chart published by the United States Coast and Geodetic Survey which showed the position of the range lights, day marks and buoys for the Torresdale Range and on the most recent channel depth statement published by the United States Corps of Engineers. The latest channel depth statement, published on May 3, 1963,[3] indicated that the minimum depth in the entire Torresdale Range was 29.9 feet. In addition, there was 4 feet of tide, so that the navigator had reason to believe that the minimum depth he would encounter in the range was 33.9 feet, which was more than adequate for the vessel's draft.
 
 
 30
 As the vessel approached the Torresdale Range, the pilot saw a Corps of Engineers dredge flotilla on the edge of the range, and attempted to establish radio contact with it. The Coast Guard vessel Zinnia responded to the Gerwi's call to the dredge flotilla and advised the pilot to pass the flotilla on the Pennsylvania (left of center) side of the channel.
 
 
 31
 Responding to the Coast Guard's suggestion, the pilot entered the Torresdale Range and aligned the Gerwi's extreme starboard side with the range lights marking the center of the range. As the Gerwi drew abeam of the drill boat accompanying the dredge, she struck rocks which pierced her 1, 2 and 3 port double bottom tanks resulting in the damages for which claim was brought in the District Court.
 
 
 32
 After the grounding, it became known for the first time that the Corps of Engineers had stopped surveying the "Torresdale Range" as plotted on the Coast and Geodetic charts in 1957 and that no depth maintenance was performed after 1955. No notice to mariners to this effect was given and no explanation was offered as to why mariners were not notified that the charted range was no longer being surveyed and maintained. Further, the Corps of Engineers continued to publish depth statements with respect to the depths in all of the ranges on the Delaware River. These statements purported to show the actual depth in all of the existing ranges, and also showed the projected depths expected upon completion of the so-called 40 foot channel project. The new "Torresdale Project" was being dredged, but at the time of the grounding it had not been completed and was not marked either by buoys or range lights. The depth figures appearing in the channel depth statement of May 3, 1963 for the "Torresdale Range" were actually the figures of the depths occurring in the new unmarked and uncompleted "Torresdale Project."
 
 
 33
 The appellants brought suit below charging the Government with negligence in that it published misleading channel depth statements which bore no relation to the actual depths appearing on the Torresdale Range as marked on the navigational chart, in failing to survey and maintain the existing Torresdale Range to the depths indicated on the depth statement, and with failing to mark and thereby make navigable the new channel for which it was publishing depth statements.
 
 
 34
 After a lengthy trial without jury, the United States District Court for the Eastern District of Pennsylvania (Wood, J.) found the United States not liable under any of these theories.[4] The trial court held that the United States had no statutory or assumed duty to survey or dredge the existing channel on a regular basis, and that the United States was not negligent in failing to notify the users of the waterway that the existing channel, as marked by range lights and buoys, was no longer being surveyed or maintained. Furthermore, it was held that the Government did not make any negligent misrepresentations in the May 3, 1963 channel depth statement. The court added that even assuming negligence on either theory, it was not satisfied that appellants had proved that the grounding of the Gerwi was caused by such negligence. Finally, the court held that the United States was not negligent in failing to mark the "project" channel.
 
 
 35
 After carefully studying the record before us, we have concluded that the trial court's decision is clearly erroneous.[5]
 
 
 36
 Every professional navigator who testified in the case agreed that any reasonable navigator reading the depth statement of May 3rd would have concluded that the figures appearing therein under the heading "Torresdale Range" referred to the depths in the channel which was marked by range lights and buoys, which the navigator was expected to rely on in navigating the river. Even the Chief of the Nautical Chart Division of the U. S. Coast and Geodetic Survey at Washington, who was in charge of the preparation of the current navigation chart in use by the river pilot on May 23, 1963[6] testified that he understood that the channel depths shown on that chart were depths for the existing channel physically marked by range lights and buoys. Hence the trial court's finding that the navigator should have interpreted the chart as amended by the depth statement of May 3rd as referring to the depths in the unmarked, uncompleted channel is not supported by any evidence.[7]
 
 
 37
 Since there was only one marked channel through which the Gerwi could safely have been navigated, it is perfectly clear that a pilot would believe that the depths given for the "Torresdale Range" referred to that channel. The trial court's finding that a range is not necessarily marked was clearly erroneous. A "range" in the navigational sense is defined as "a pair of lights or day-beacons used to mark a line of definite bearing." J. Hoel, Naval Terms Dictionary, (2nd ed. 1966). Similarly a "range" is "a direction indicated by two objects in line, as leading lights of a channel." W. A. McEwen and A. H. Lewis, Encyclopedia of Nautical Knowledge (1953). The Corps of Engineers itself has prepared a Glossary of Mapping, Charting and Geodetic Terms (2nd ed. 1969) in which a "range" is defined as "the well-defined lines or courses whose positions are known and are used in determining soundings in a hydrographic survey," and a "range signal" is "a buoy, rod, flag or other similar object used to mark and identify range points when taking soundings during a hydrographic survey." Every expert navigator agreed that unless the depths given for a "range" referred to the range as marked on the navigational chart, the information as to depths would be entirely useless for navigational purposes because the pilot would have no way of knowing precisely where the stated depths were to be found.
 
 
 38
 A close examination of the charts themselves supports the reasonableness of this interpretation. The data for the "Torresdale Range" consists of nine columns. The first shows the "date of survey" as of November 7, 1962. Only the next three columns are headed "PROJECT" giving the width (400'), length 1.39 miles) and depth (40') of the proposed channel. The remaining five columns give the "minimum depths in the channel entering from seaward" at various points in the range. There is no indication that these depths are in the "project" and all the professional navigators agreed there was nothing appearing on the depth statement to indicate that the depths given were for a channel other than the one marked with range marks and buoys. Hence, on the day of the grounding, the Gerwi's navigator, relying upon the accuracy of the charts and depth statements published by the United States Government did reasonably conclude that the minimum depth in the Torresdale Range would be 29 feet 9 inches. He would also reasonably believe that the Corps of Engineers were regularly surveying and maintaining that channel, particularly since it was the only marked channel for ocean-going vessels in this area of the river which is heavily trafficked by large ore vessels such as the Gerwi bringing ore to the Fairless plant of the United States Steel Company. The evidence is clear, however, that the Corps of Engineers had virtually abandoned the marked channel so that no depth maintenance had been performed since 1955, and that it had not been surveyed since 1957, except where it overlapped with the "project."[8]
 
 
 39
 The Government's argument is that it never had a duty (statutory or otherwise) to survey or maintain the Torresdale Range even though it had marked it with range lights and buoys. We find the trial court's acceptance of this position to be clearly erroneous.
 
 
 40
 It is unnecessary for us to decide whether the Government had a statutory duty to maintain and survey the existing Torresdale Range. In Indian Towing of United States, 350 U.S. 61, 64, 76 S.Ct. 122, 100 L.Ed. 48 (1955), the Supreme Court observed, "It is hornbook tort law that one who undertakes to warn the public of danger and thereby induces reliance must perform his 'good samaritan' task in a careful manner.":
 
 
 41
 The Coast Guard need not undertake the lighthouse service. But once it exercised its discretion to operate a light on Chandeleur Island and engendered reliance on the guidance afforded by the light, it was obligated to use due care to make certain that the light was kept in good working order; and, if the light did become extinguished, then the Coast Guard was further obligated to use due care to discover this fact and to repair the light or give warning that it was not functioning.[9] 350 U.S. at 69, 76 S.Ct. at 126.
 
 
 42
 In the present case, the Government had published precise surveyed depths for the existing Torresdale Range until January 23, 1957. Suddenly, with no change in chart format, figures were inserted giving the depths in the "project channel" which was started at that time. The chart dated November 12, 1957, and all charts thereafter, gave depths for the "Torresdale Range" which actually were measured in the unmarked, uncompleted project. The Government's "reason" for giving up maintenance and surveying operations in the marked channel was merely that a new channel was being dug. Certainly, no reasonable navigator would anticipate such irresponsibility on the part of the Government, and the abandonment of the existing channel with no notice to navigators was clearly negligent.
 
 
 43
 Finally, the trial court held that appellants had not proved that the actions of the United States, even if negligent, were the proximate cause of the grounding of the Gerwi if negligence was shown:
 
 
 44
 Even assuming in arguendo that the government had assumed such a duty, the libellants have not carried their burden of convincing us that the failure to survey at some given interval was the cause of the grounding of the Gerwi. It is uncertain when the shoal upon which the Gerwi grounded was formed. Moreover, we are unable to determine whether the shoal was man-made or natural: the formation could have been caused either by reformation of the river itself, by the dredging operation that was taking place nearby, or for some other reason of which we are not aware. Consequently, even if the Government had not surveyed the Torresdale 25' channel, say, every year, we are not convinced that this would have averted the unfortunate accident of the Gerwi. 305 F.Supp. at 891.
 
 
 45
 The trial court's finding that the plaintiffs have not proved that the obstruction was one which the Government, by the exercise of reasonable care, could have discovered and removed might be dispositive of the case if the only ground for the plaintiffs' action was the Government's negligence in failing to survey and maintain the existing channel. However, the Government's negligence here is considerably more than a mere failure to exercise reasonable care. The principal negligent act was the publishing of false and misleading information which was calculated to induce reliance and did in fact induce reliance on the part of the navigator of this vessel. Under these circumstances, the plaintiffs satisfied their burden merely by showing that the information was wrong and that as a result of relying on this wrong information the damage occurred.[10]
 
 
 46
 Our conclusion, therefore, is that the appellants have proven that the negligence of the United States Government was the legal cause of the grounding of the Gerwi. There is no dispute that the extent of the monetary damage to the vessel was $201,378.67. Accordingly, the judgment of the District Court will be reversed and the case remanded to that court with instructions to enter judgment in the above amount in favor of appellants, together with such interest, if any, as the District Court may find to be due.
 
 
 47
 VAN DUSEN, Circuit Judge (dissenting).
 
 
 48
 I respectfully dissent and would affirm the district court judgment of September 8, 1969. . . .
 
 
 
 [1]
 Bergens Skibsassuranseforening of Bergen, Norway, a Norwegian underwriter, was the hull underwriter on May 23, 1963, and was added as libellant in this action
 
 
 [2]
 The district court decision is reported at 305 F.Supp. 882 (1969)
 
 
 [3]
 The standard of "skill and knowledge required of a pilot in charge of a vessel on the rivers" was first set forth in Atlee v. Union Packet Company, 88 U.S. (21 Wall.) 389, 396, 22 L.Ed. 619 (1874), a case cited throughout the years by numerous courts, including the Third Circuit. In that case, the Supreme Court stated:
 ". . . [T]he pilot of a river steamer, like the harbor pilot, is selected for his personal knowledge of the topography through which he steers his vessel. . . . He must know where the navigable channel is. . . . He must also be familiar with all dangers that are permanently located in the course of the river. . . . All this he must know and remember and avoid. . . ."
 In commenting on this standard, Judge Aldrich has stated that "this salutary principle has not diminished simply because better charts may be available today than they were 75 years ago. On the contrary, a pilot is still expected to have local knowledge, and he is not doing his duty if he relies merely on outward appearances and on government charts available to anyone." Essex County Electric Company v. Motor Ship Godafoss, 129 F.Supp. 657, 660 (D.Mass.1955). This circuit has more recently stated that ". . . [t]he law imposes a duty upon him [the pilot] . . . to be 'constantly informed of changes in the current of the river' and the 'changes made by the hand of man or the action of the elements in the path of his vessel.' Davidson Steamship Co. v. United States, 1907, 205 U.S. 187, 194, 275 S.Ct. 480, 483, 51 L.Ed. 764. . . . Where the river pilot has the means of obtaining information concerning these changes, he is deemed in law to know them." Utility Service Corp. v. Hillman Transportation Co., 244 F.2d 121, 124 (3d Cir. 1957). See The Severance, 152 F.2d 916, 920 (4th Cir. 1945); Continental Oil Co. v. M. S. Glenville, 210 F.Supp. 865, 870 (S.D.Texas 1962).
 
 
 [4]
 It is only where negligently given false information causes harm that liability results. See Restatement (2d) of Torts, Sec. 311 (1965)
 
 
 [5]
 Reproduced at 305 F.Supp. 886. As to the duty of the Government to use due care in the preparation of charts and notices, see De Bardeleben Marine Corp. v. United States, 451 F.2d 140, 149 (5th Cir. 1971). Given this record, the trial judge was justified in concluding that Lappe should have questioned his interpretation of the coast geodetic chart (L-7) and the May 3, 1963, statement (L-9) and sought further clarification. See 305 F.Supp. at 893-894. If Lappe had gone to other sources such as the map (Exhibit R-1) which he was advised to purchase by a note at the bottom of the May 3 statement (Exhibit L-9), he would have discovered the true depths of the two channels. At N. T. 165-66, pilot Lappe admitted that if Exhibit R-1 had been in his possession he would have "questioned [his interpretation of L-7 and L-9] immediately. There would have been great question in [his mind]. . . ."
 
 
 [6]
 Similarly, the district court stated: "In short, we do not think that the publication of the depth statement of May 3, 1963, was the cause of the Gerwi's grounding" (894 of 305 F.Supp.)
 
 
 [1]
 Bergens Skibsassuranseforening of Bergen, Norway, a Norwegian underwriter, was the hull underwriter on May 23, 1963, and was added as libellant in this action
 
 
 [2]
 The vessel's navigation was in the charge of a compulsory pilot licensed by the State of Pennsylvania to pilot ships of foreign registry up the Delaware
 
 
 [3]
 Exhibit L-9, reproduced at 305 F.Supp. 886
 
 
 [4]
 The decision below is reported at 305 F.Supp. 882 (1969)
 
 
 [5]
 See McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20 (1954) as to the scope of review of a judgment of a trial court, sitting without a jury in admiralty, in a negligence action: "A finding is clearly erroneous when 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."' 348 U.S. at 20, 75 S.Ct. at 8
 
 
 [6]
 The chart referred to, Exhibit L-7 was used to illustrate the coast geodetic chart in use at the time of the accident. Actually, it was issued on May 25, 1963, which was two days after the grounding. Apparently, the original exhibits were lost, and L-7 was agreed to be a fair representation of the chart which the pilot had with him on the day of the accident. This exhibit, showing depths supplied by the Corps of Engineers for the Torresdale Range, presents the same interpretive problem involved in the May 23, 1963 Corps of Engineers' chart described above
 
 
 [7]
 See Discussion, 305 F.Supp. 882, 892-893
 
 
 [8]
 In October of 1962, the Tyne Ore grounded in the same general vicinity as the Gerwi incident. After this prior grounding, the Corps of Engineers sounded only this portion of the river, found a shoal formation, and removed it. The center line of the old channel was then swept to a depth of 27'
 
 
 [9]
 On remand, judgment was entered in favor of the United States. The District Court found plaintiff to be contributorily negligent and that the Coast Guard had exercised reasonable care in discovering a light failure. Indian Towing Company v. United States, 182 F.Supp. 264 (E.D.La. 959), affd. 276 F.2d 300 (5th Cir.) cert. denied, 364 U.S. 821, 81 S.Ct. 56, 5 L.Ed.2d 51 (1960)
 
 
 [10]
 This principle has been enunciated in the Restatement (Second) of Torts Sec. 311 (1965) as follows: "One who negligently gives false information to another is subject to liability for physical harm caused by action taken by the other in reasonable reliance upon such information where harm results to the other . . ."